# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs February 19, 2015

## STATE OF TENNESSEE v. KENNETH DUANE HALL

**Appeal from the Criminal Court for Knox County**
**No. 98674     Mary Beth Leibowitz, Judge**

---

**No.  E2014-02078-CCA-R3-CD - Filed June 30, 2015**

---

The Defendant, Kenneth Duane Hall, was found guilty by a Knox County Criminal Court jury of rape, a Class B felony.  *See* T.C.A. § 39-13-503 (2014).  The trial court sentenced the Defendant to twelve years' confinement at 100% service as a violent offender.  On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred by admitting evidence related to domestic violence.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Keith Lee Lieberman (on appeal, at sentencing, and at motion for new trial) and Mitch Harper (at trial), Knoxville, Tennessee, for the appellant, Kenneth Duane Hall.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At the trial, L.B.[1] testified that she was an alcoholic and that her problems with alcohol developed later in life.  At the time of the trial, she had sought treatment for her addiction and was undergoing therapy.  She said that at the time she met the Defendant, she was not sober.  During their fourteen-month relationship, she worked at a department store

---

[1]  It is this court's policy to refer to victims of sexual assault by their initials.

and performed odd jobs with the Defendant. L.B. and the Defendant worked as part of the cleanup crew at Thompson-Bowling Arena and Neyland Stadium.

L.B. testified that she and the Defendant were each homeless when they met in April or May 2010. L.B. lived under a bridge behind Keener Lighting Company, but she eventually found housing through Helen Ross McNabb Center. She obtained an apartment at Isabella Towers on May 13, 2011, and on May 22, she and the Defendant moved furniture into her apartment. She said that the following day, the Defendant woke up "ranting" about L.B.'s not appreciating him. She said the Defendant slit the cushions on the sofa, smashed the television, and verbally belittled and degraded her. The Defendant told her, "You're just like the rest of them b------. You don't appreciate anything." Although L.B. did not recall what she said to the Defendant, she recalled the Defendant's saying, "Just because you get this apartment don't think that you run everything." She replied, "Well, God runs things, and all I ask is that you respect my apartment." She said the Defendant threw a drink on her, hit her on the back of the head with his fist, dragged her to the floor by her hair, and choked her with his hands. L.B. thought the Defendant was going to kill her.

L.B. testified that the Defendant abruptly stopped the attack and that she crawled to the foot of the bed after catching her breath. She said they exchanged words, and the Defendant pushed her on the bed. She said, "[He] tried to remove my shorts, which he did, and I was trying to fight him off." She told the Defendant, "No, stop; don't do this." She said that the Defendant penetrated her vagina with his penis, that he got up and pulled up his pants, and that he left after taking her only apartment key. She thought the Defendant stayed periodically with another woman.

L.B. testified that she called 9-1-1 and that she went to the hospital because she thought she had a concussion and broken fingers. At the hospital, she told the investigating officer that she was unsure if she wanted to prosecute the Defendant. She denied calling the officer after the night of the incident. She said a Sexual Assault Crisis Center (Center) employee photographed the bruises while she was at the hospital and asked if she wanted a rape kit examination performed. L.B. said that she refused the examination because she had consensual sex with the Defendant recently and because she did not want "to be invaded again" after being raped. She denied having any genital injuries. She said that she did not have a concussion and that her fingers were badly bruised but not broken.

L.B. testified that she returned home after leaving the hospital and that she next saw the Defendant one or two days later when he returned. She said the Defendant had the same demeanor, degraded her, and was belligerent. She allowed the Defendant to stay at her apartment because she feared him, she had low self-esteem, and he controlled her apartment key, money, and telephone. She said the Defendant always possessed her cell phone,

monitored her calls, and called some of the telephone numbers to determine to whom she spoke. She was too afraid to call the investigating officer when the Defendant returned to her apartment. She said that she had been to the emergency room on three previous occasions because of the Defendant's physical abuse.

L.B. testified that the Defendant stayed at her apartment until July 2011, although she asked him several times to leave after the alleged rape and that the Defendant always replied that he would leave when he was ready, that she was his property, and that their relationship was over when he said it was over. She said that the abuse leading up to the end of their relationship became more severe and frequent. She recalled the Defendant's hitting and stabbing her, burning her with a cigarette, and cutting her hair with a butcher knife. She denied calling the police on those occasions and said she "made up [her] mind . . . to get away one way or another." L.B. realized she could not "fix" the Defendant's rage.

L.B. testified that in August 2011, she asked Carolyn Moore from the Center to help her obtain an order of protection. After L.B. obtained an order of protection against the Defendant, she spoke to Ms. Moore about reporting the rape that occurred in May. She said Ms. Moore spoke to the investigating officer, who told Ms. Moore it was still possible to pursue charges against the Defendant. L.B. provided a statement to the officer, and a warrant was issued for the Defendant's arrest. She admitted she cared about the Defendant and said her feelings for him also played a role in her hesitation to prosecute.

On cross-examination, L.B. testified that because the Defendant took her apartment key on the day of the incident, her door remained unlocked while she was treated at the hospital. She said that although the Defendant returned with her apartment key a couple of days later, the Defendant maintained control of the key. She said the Defendant brought the television to her apartment before he destroyed it on the morning of the incident.

L.B. testified relative to the previous incidents of physical abuse that she never called the police. She said in that June 2010, she was taken to the hospital and stayed overnight because of vaginal tearing she suffered after having consensual sex with the Defendant. Hospital staff advised her and the Defendant to refrain from sexual relations for two weeks. She did not recall the sexual assault nurse's telling her on the day of the incident that previous consensual sexual encounters were irrelevant for purposes of the rape kit examination.

On redirect examination, L.B. testified that in addition to the Defendant's stabbing and cutting her hair with a knife before the incident in this case, in January 2011 the Defendant hit her in the face, breaking four bones. She required eye surgery to repair the

damage.  She admitted she told hospital staff that she had been mugged.  L.B. also said she was treated at the hospital after the Defendant bit her forehead during another incident.

On recross-examination, L.B. testified that the corrective eye surgery occurred in February but that she was uncertain if the Defendant took her to the hospital.  She said, though, it would not have been unusual for the Defendant to have been with her.

Glenna Ford, a sexual assault nurse examiner at the Center, testified that the victim's left finger and upper and lower lips were bruised.  The victim also displayed redness, swelling, and scarring around her right eyebrow, cheek, neck, and left ankle.  Photographs of the injuries were received as exhibits.

On cross-examination, Ms. Ford testified that she did not perform the victim's sexual assault examination.  She said the examining nurse responded to the hospital after the Center received a telephone call.  She said if a victim told an examining nurse that she had consensual sex two days before an alleged assault, the nurse would document the information and provide the victim with information relative to the sexual assault examination.

On redirect examination, Ms. Ford testified that it was common for a victim to be reluctant to submit to an examination because of the trauma.  She said that had the victim complained of vaginal pain, she would have been examined for trauma but that the victim did not complain of vaginal pain.

The hospital medical records were received as an exhibit.  The records reflect that the victim reported that her boyfriend assaulted and raped her inside her apartment.  The examination showed facial, scalp, and hand contusions but no broken bones.  She was prescribed pain medication and instructed to return to the emergency room if her condition worsened.

Knoxville Police Investigator Brian Moran testified that he responded to the hospital regarding an alleged rape complaint on May 22, 2011.  He said the victim reported that her boyfriend, the Defendant, assaulted and raped her inside her apartment.  He said that the victim was unsure whether she wanted to prosecute the Defendant and that he told the victim to call him after her release from the hospital.  She did not contact him, and he unsuccessfully attempted to contact the victim twice after the incident occurred.

Investigator Moran testified that the victim contacted him in August 2011 about prosecuting the Defendant.  He said that in his experience, victims of domestic assault and rape were commonly reluctant to prosecute their attackers.

On cross-examination, Investigator Moran testified that if a victim were to choose not to prosecute an offender, the police department would not move forward. He said he did not formally interview an identified attacker unless he was certain a prosecution would occur. He stated that if the victim had stated at the hospital she intended to prosecute the Defendant, he would have proceeded with his investigation. He said the case was inactive until the victim contacted him.

Carolyn Moore, a client advocate at the Center, testified that the victim's case was assigned to her in June 2011. She said advocates were assigned to help victims of sexual assault regardless of whether a victim chose to prosecute an attacker. She stated that the first time she called the victim, she heard a male voice in the background saying, "[G]et off the phone; who are you talking to? Get off the phone." She said the victim stated that she was late for an appointment and hung up the phone immediately. Ms. Moore did not have further contact with the victim until August 2011.

Ms. Moore testified that the victim contacted her in August 2011 about obtaining an order of protection and that she assisted the victim in the process. For purposes of the order of protection, Ms. Moore went to the victim's apartment to take photographs of the sofa the victim said the Defendant destroyed with a knife. A photograph of the sofa was received as an exhibit.

On cross-examination, Ms. Moore testified that the photograph of the sofa was taken after August 1, 2011, and possibly in September. She said the sofa was sliced several times and noted a slice in each cushion and arm.

Upon this evidence, the Defendant was convicted of rape. This appeal followed.

## I

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He argues the victim's "scant and questionable" testimony did not provide sufficient evidence of rape. The State responds that the jury credited the victim's testimony relative to the Defendant's conduct, which provides sufficient evidence to support the conviction. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape is defined, in relevant part, as the "unlawful sexual penetration of a victim by the defendant" and "is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)(2). Sexual penetration is "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2010) (amended 2013).

The record reflects the victim testified that on May 22, 2011, the Defendant awoke in an agitated state, slit sofa cushions with a knife, smashed a television, and verbally belittled and degraded the victim. After a verbal exchange, the Defendant threw a drink on the victim, struck her on the head with his fist, dragged her to the floor by her hair, and choked her with his hands. Although the Defendant abruptly stopped attacking the victim, the Defendant pushed the victim onto a bed. The victim testified that the Defendant removed her shorts, as she attempted to "fight him off." Although she told the Defendant, "No, stop; don't do this," the Defendant penetrated her vagina with his penis. We conclude that this evidence is sufficient to support the conviction. The Defendant's argument focuses on his belief the victim was not credible, but questions related to witness credibility and the weight of the evidence were resolved by the jury. The jury's verdict reflects that it credited the victim's testimony that the Defendant penetrated her vagina with his penis and that the penetration was accomplished without her consent. The Defendant is not entitled to relief on this basis.

## II

## Evidence of Domestic Violence

The Defendant contends that the trial court erred by permitting the State to present evidence of domestic violence. He argues the probative value of the evidence did not outweigh its prejudicial effect.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is an abuse of discretion, provided a trial court substantially complies with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

Before the trial, the State filed a response to the Defendant's motion for disclosure of evidence of other crimes, wrongs, and acts pursuant to Tennessee Rule of Evidence 404(b). The State disclosed that it intended to present evidence that (1) in August 2011, the Defendant bit the victim on the forehead and was charged with assault, (2) on January 10, 2011, the Defendant hit the victim in the left eye, which broke her orbital bone and required surgery to repair, (3) before June 19, 2011, the Defendant beat and cut the victim with a knife, (4) on July 2, 2011, the Defendant hit the victim and created a disturbance that resulted in a neighbor's calling 9-1-1, (5) on July 4, 2011, the Defendant beat the victim, burned her with a cigarette, and assaulted her with a knife, (6) the Defendant beat the victim for the last time on July 22, 2011, and (7) the Defendant had sexually assaulted the victim on prior occasions.

At the motion hearing, trial counsel stated that given the nature of the case, he anticipated trial testimony relative to the Defendant and the victim's relationship problems. Counsel told the trial court that he and the Defendant understood that the items (1) through (5) would "come to light" during the trial. Counsel objected to the allegation of previous sexual assaults, beating the victim for the last time, and "those types of things . . . that would not satisfy the analysis under 404." The court clarified that counsel was only objecting to items (6) and (7).

The prosecutor argued that although all the items were bad act evidence, some of which occurred before and some after the alleged rape, the evidence was admissible to show the relationship between the parties. The prosecutor stated that the jury needed to understand why the victim did not prosecute the Defendant until August 2011, although the incident occurred in May. The prosecutor stated that the victim would likely be cross-examined about the delay and that the victim had an explanation. The prosecutor explained that this was a domestic violence case and that the Defendant was not being prosecuted as a "typical sex offender." Relative to any previous sexual assaults, the victim told the prosecutor that the incident was not the first time the Defendant had "forcibly sexually penetrated her." However, the prosecutor withdrew item (7) because the victim was unable to identify specific dates of any previous sexual assault. Relative to item (6), the prosecutor stated the evidence was relevant because the victim recalled when she decided she had endured enough abuse and because the incident resulted in the victim's prosecuting the Defendant. The prosecutor claimed the evidence would only be used to show the victim was credible and the reason she decided to prosecute the Defendant. The prosecutor also stated that, in part, the victim decided to prosecute because the victim learned the Defendant was accused of raping another woman. Although the prosecutor did not intend to present such evidence in her case-in-chief, she stated she would question the victim about the allegation if the door was opened on cross-examination. The prosecutor instructed the victim not to mention the previous rape allegation.

The trial court found that items (1) through (6) were admissible. Relative to item (6), the court found that the July 22, 2011 incident of physical abuse completed the story of the parties in order for the jury to understand what happened and why the victim did not report the May incident immediately. The court noted the evidence was "part of a pattern." The court found that the probative value of the evidence outweighed any prejudicial effect. The court excluded any evidence related to item (7).

The Defendant concedes in his brief that trial counsel "for whatever reason . . . did not appear to object to the introduction of most of this . . . evidence" and requests that this court consider the issue as a matter of plain error. The State responds that the Defendant is not entitled to plain error relief because it is unnecessary to do substantial justice.

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Relative to items (1) through (5) of the State's response under Tennessee Rule of Evidence 404(b), the record reflects that trial counsel did not object to the admission of the evidence and noted that he and the Defendant anticipated its admission at the trial. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection . . . appears of record[.]"). The issue is waived, and we conclude that plain error relief is not necessary because a clear and unequivocal rule of law was not breached. The trial court substantially complied with the procedural requirements of Rule 404(b) and concluded that the evidence was relevant to explain why the victim delayed prosecuting the Defendant and that the

probative value of the evidence was not outweighed by the danger of unfair prejudice. The court did not abuse its discretion, and the Defendant is not entitled to relief on this basis.

Although the record reflects that trial counsel objected to the admission of evidence related to the last incident of physical abuse in item (6), the record reflects that the trial court did not abuse its discretion by permitting the State to present such evidence. At the pretrial hearing, the court determined that the relevant and material issue was the victim's delay in prosecuting the Defendant and that the evidence was necessary to show why the victim did not prosecute the rape immediately. The evidence was only used to show the credibility of the victim and the reason she ultimately decided to prosecute the Defendant. The court, likewise, concluded that the probative value of the evidence outweighed the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

Relative to evidence of previous sexual assaults in item (7), the record reflects that the victim told the prosecutor that the incident at issue was not the first time the Defendant had "forcibly sexually penetrated her." However, the prosecutor withdrew her request to present such evidence because the victim was unable to identify specific dates of any previous sexual assault. As a result, the trial court excluded any reference to previous sexual assaults. The Defendant, though, argues that the prosecutor, in direct contravention of the court's ruling, questioned the victim about previous sexual assaults, which resulted in the victim's testifying that the Defendant previously raped her. However, we conclude that the record reflects otherwise.

During the victim's cross-examination, trial counsel questioned the victim about her failure to report to the police incidents of physical abuse that resulted in the Defendant's injuring her. On redirect examination, the following exchanged occurred:

Q    Were there other occasions that you were injured by [the Defendant] that you didn't report to the police?

A    Yes.

. . .

Q    Okay. Were there occasions prior to May 22nd when you were raped that you did not report him injuring you?

A    Yes.

Q    Can you tell the jury when?

A No. All I know is I would tell him that he's hurting me and we would not stop.

Q I guess you misunderstood me. Were there occasions when you had to seek medical treatment as a result of his injuries that you did not report to the police?

A Yes.

Q And can you tell the jury about that?

A The previous January he hit me in my face, broke four bones, including the – the floor that hold your eyeball up. And I have to have surgery, eye surgery.

Q And did you tell people at the hospital what happened to you?

A No.

Q Did you tell them something that didn't happen to you?

A Yes.

Q What did you tell them?

A Told them that I was mugged.

The record reflects that the prosecutor did not question the victim about previous incidents of sexual assault in direct contravention of the trial court's ruling. We note the prosecutor willingly withdrew her request to present such evidence at the pretrial hearing. At the trial, the prosecutor attempted to elicit testimony relative to the Defendant's injuring the victim on other occasions to explain why the victim delayed the prosecution. The victim misunderstood the prosecutor's question, and the prosecutor immediately clarified her question for the victim. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE